IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TRUSTEES OF THE UTAH CARPENTERS' AND CEMENT MASONS' PENSION TRUST,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br>DAW, INC., n/k/a DAW CONSTRUCTION GROUP, LLC,<br><br>Defendant. | ORDER and MEMORANDUM DECISION<br><br><br><br>Case No.  2:07-CV-87 TC |

Plaintiffs, the Trustees of the Utah Carpenters' and Cement Masons' Pension Trust (the Trustees), are the trustees of a multiemployer pension plan.  The plan, which received contributions from employers on behalf of employees covered under collective bargaining agreements, is governed by federal law.  The Trustees bring this action against Daw Construction Group, LLC (DCG), claiming that DCG is responsible for withdrawal liability incurred by Daw, Inc. (Daw).  The Trustees contend that for purposes of withdrawal liability, DCG should stand in the shoes of Daw.  Moreover, the Trustees argue that because DCG did not timely initiate arbitration after the Trustees' asserted a claim of liability, DCG cannot contest any aspect of that liability in court.  DCG has counterclaimed against the Trustees, seeking the return of contributions to the plan that DCG claims were unlawful.  The Trustees and Daw have both moved for summary judgment on their claims.

For the reasons discussed below, the court finds that DCG is responsible for Daw's withdrawal liability.  Moreover, because DCG did not initiate an arbitration challenging the amount of Daw's withdrawal liability, DCG waived the right to contest that liability and a judgment against DCG is appropriate.  The only question left to answer is the amount of judgment, as explained more thoroughly below.  The court further finds that DCG's argument for summary judgment on its counterclaim has no merit.  Accordingly, summary judgment is GRANTED in favor of the Trustees and DCG's motion for summary judgment is DENIED.

## BACKGROUND

Daw was a Utah construction company operating in many states, including Utah, for about fifty years. Over the years, Daw was a party to several collective bargaining agreements with its employees who were union members.  Early on, various Daw employees belonged to the Mountainwest Regional Council of Carpenters.  Later, Daw's employees were members of the Southwest Regional Council of Carpenters (SWRCC).

The SWRCC had an agreement with a multiemployer pension plan known as the "Utah Carpenters' and Cement Mason's Pension Trust" (the Plan) that the Plan would manage SWRCC member pensions.  The Trustees managed the Plan.  From about 1994 to January 2004, Daw contributed 10¢ per hour worked by its union employees to the Plan.

In mid-February 2004, Daw sold all of its assets to L. D. Bowerman.  The purchase price of the assets was the assumption of specified liabilities.  Among the assets purchased was "[a]ll the Seller's interest in its contracts or agreements with its employees..."  (Ex. D(1) to Pls.' Mem. Supp. Mot. Summ. J. ("Pls.'s Mem. Supp.") at DAW00002.)   The liabilities assumed included "[a]ny and all current trade debt such as payables incurred in the ordinary course of business."

2

(Id. at DAW00003.)

At the time Daw sold its assets, Daw had a collective bargaining agreement with the SWRCC called the Drywall Memorandum Agreement.  (Ex. D(13) to Pls.' Mem. Supp.)  That agreement was signed by Ryan Daw, one of Daw's principals, and by a representative of the SWRCC on January 19, 2004.  The Drywall Memorandum Agreement incorporates the "Trust Agreements," but does not specifically name the Plan.  (Id. at SWC001.)  Also on January 19, 2004, Ryan Daw signed the Utah Appendix to the Drywall Master Agreement.  (Ex. D(14) to Pls.' Mem. Supp.)  That appendix specifies that a benefit of "$1.21 (including 10¢ to Utah Pension Plan)" should be paid to the Plan on behalf of certain employees.  (Id. at SWC005.)

In March 2004, after Mr. Bowerman purchased Daw, he formed a holding company called L. D. Bowerman Associates, LLC to hold the assets.  In addition, Mr. Bowerman formed a company named Daw Construction Group, LLC ("DCG"), and assigned all the purchased assets to DCG.  The following are some, but not all, of the material facts relating to the relationship between DCG and Daw after DCG was assigned Daw's assets:

- DCG used Daw's license for several months on its contracting jobs;

- DCG continued to employ a significant majority of Daw's employees, including SWRCC union members;

- DCG issued a press release saying that it would continue Daw's business and keep Ryan Daw and Gordon Daw as managers (Ex. D(8) to Pl.'s Memo. in Support);

- DCG continued working on Daw's outstanding projects;

- DCG operated from Daw's previous location; and

- Until September 2004, DCG's 10¢ per hour payments were tendered to the Plan

3

with checks from a bank account in the Daw name and signed by Ryan Daw.

On January 26, 2005, DCG entered into a Memorandum of Understanding with the SWRCC. (Ex. H(16) to Pls.' Mem. Supp.)  That agreement stated that the Drywall Memorandum Agreement was amended to increase DCG's contribution to the Plan to 52¢ per hour.  From January 2005 to July 2006, DCG paid the Plan contributions of 52¢ per hour.  DCG stopped making contributions to the Plan in August 2006.

On July 3, 2006, the Trustees sent a notice to Daw stating that as of January 4, 2004, Daw had withdrawn from the Plan.  (Ex. O to Pls.' Mem. Supp.)  The Trustees demanded withdrawal liability from Daw of about $893,000.  (Id.)  An attorney, who claimed to represent Daw, responded to the Trustees on August 2, 2006, asking why Daw was being assessed withdrawal liability when there was an agreement in place to pay the Plan 52¢ per hour.  (Ex. F(5) to Pls.' Mem. Supp.)

On August 18, 2006, DCG itself responded to the Trustees.  DCG maintained that DCG was a separate entity from Daw and referred the Trustees to Daw for payment.  (See Ex. N. to DCG's Memo. in Support.)  On January 8, 2007, the Trustees informed DCG that it was their position that DCG was responsible for Daw's withdrawal liability.  (See Ex. R to Pls.' Mem. Supp.)  DCG did not demand arbitration or bring any action related to the notice of withdrawal liability to Daw or the Trustees' later assertion that DCG should pay for Daw's liability.

On February 14, 2007, the Trustees filed this action, seeking to collect Daw's withdrawal liability from DCG.  On March 12, 2007, DCG filed a counterclaim, alleging that all of the payments it made to the Plan on its own behalf from about January 2005 to August 2006 had been unlawful and demanding them back.

**ANALYSIS**

## I.     Summary Judgment Standard

"Summary judgment is proper if the evidence submitted by the parties, viewed in the light most favorable to the non-movant, indicates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Faustin v. City & County of Denver, Colo., 423 F.3d 1192, 1198 (10th Cir. 2005) (citations and internal quotation marks omitted). See also Fed R. Civ. P. 56(c). "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-moving party based on the evidence presented." Chasteen v. UNISIA JECS Corp., 216 F.3d 1212, 1216 (10th Cir. 2000). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The parties are well acquainted with the Multiemployer Pension Plan Amendments Act, 94 Stat. 1208 (1980), which governs this dispute. Accordingly, the court will not engage in a detailed discussion of that statute and its purposes. Instead, the court will discuss the specific issues raised by the parties' motions.

## II.    Is DCG Responsible for Daw's Withdrawal Liability?

The first question in deciding the Trustees' motion for summary judgment is whether DCG is responsible for Daw's withdrawal liability.[1]  A successor company may be charged with

_____

[1] The Trustees argue that this question should be resolved in arbitration, while DCG argues that an arbitrator has no power to decide this question. The court clearly has the power to

the predecessor's withdrawal liability.  See Artistic Carton Co. v. Paper Indus. Union-Mgmt.

Pension Fund, 971 F.2d 1346, 1352-53 (7th Cir. 1992).  To show that a company is the successor

of a purchased company for purposes of liabilities incurred under the purchased company's

collective bargaining agreements, courts look at various factors.  See National Labor Relations

Bd. v. Tricor Prods., Inc., 633 F.2d 266, 269 (10th Cir. 1980).  These include (1) anti-union

motivation; (2) continuity of workforce; (3) continuity in management; (4) continuity of

equipment and location; (5) retention by the successor of accounts and customers; (6) changes in

the type and amount of work performed; and (7) the successor's assumption of the predecessor's

liabilities.  See id. at 269-70.

In light of the above factors, the court finds the following facts significant:  nothing in the

record indicates that Daw sold its assets to Mr. Bowerman to avoid Daw's collective bargaining

agreement;  DCG continued to employ substantially the same workforce as Daw;  there is no

actual dispute (DCG's conclusory assertions are not evidence) that Ryan Daw continued as a

management level employee at DCG;   DCG represented to the public that Ryan Daw would stay

at DCG as a manager; for several months after DCG purchased Daw, Ryan Daw signed checks to

the Plan on behalf of DCG (the fact that the Trustees might not have cashed these checks is

immaterial);  Ryan Daw attended Plan meetings on DCG's behalf after DCG acquired Daw;

DCG  continued to use Daw's business license, stayed at Daw's location, retained Daw's

customers and took over Daw's new and existing projects;  DCG remained in the same line of

---

decide this question and will do so now.  See, e.g., Transpersonnel, Inc. v. Roadway Exp., Inc.,
422 F.3d 456, 459 n.1 (7th Cir. 2005) (collecting cases finding that the question of whether an
entity is an "employer" should be decided by the court.)

business that Daw was in;  DCG contractually assumed substantially all of Daw's liabilities; and

when DCG bargained with the SWRCC, it did not draw up an entirely new agreement, but

instead amended the agreement between Daw and the SWRCC.

Various other undisputed facts are relevant to this analysis but the court views the facts

highlighted above as sufficient to support its conclusion.  In sum, there is no dispute of material

fact on the issue of whether DCG is a successor to Daw.  As Daw's successor, DCG is

responsible for Daw's withdrawal liability.

### III.    Has DCG Waived Its Right To Challenge Its Withdrawal Liability?

The Trustees argue that by failing to demand arbitration, DCG  waived any objections to

the Trustees' determination of Daw's withdrawal liability.  Under 29 U.S.C. § 1401 (a)(1), an

employer must initiate arbitration within 60 days after the earlier of (1) a plan's notification to

the employer; or (2) 120 days after the employer responds to the notification.  If the employer

does not seek arbitration within that time, it "waives any defenses to collection actions that could

properly have been heard before the arbitrator" and "the amount demanded by the pension plan

sponsor becomes due and owing."  Trustees of Colo. Pipe Indus. Pension Trust v. Howard Elec.

& Mech. Inc., 909 F.2d 1379, 1385-86 (10th Cir. 1990).

DCG does not dispute that it did not seek arbitration within 120 days after initially

contesting that it should pay Daw's withdrawal liability.  Nor does DCG dispute that an arbitrator

would have the power to hear its challenges to withdrawal liability, with the exception of the

question of whether DCG is Daw's successor.  But DCG argues that because it had no notice

until the present Order that it was Daw's successor,  DCG's deadline to seek arbitration should

be equitably tolled.

The Seventh Circuit addressed a similar argument in <u>Central States, Southeast &</u> <u>Southwest Areas Pension Fund v. Slotky</u>, 956 F.2d 1369 (7th Cir. 1992).  In <u>Slotky</u>, Burton Slotky, an individual, disputed that he was a member of a commonly controlled group with a bankrupt employer and was therefore liable for the employer's withdrawal liability.  <u>See</u> <u>id.</u> at 1372-73.  The court ruled that Mr. Slotky was a member of the commonly controlled group and concluded that he could not dispute the amount of withdrawal liability assessed to the employer because he had failed to arbitrate in time.  <u>See</u> <u>id.</u> at 1374-75.  In response Mr. Slotky's assertion that the arbitration deadline should be equitably tolled, the court responded that:

> Slotky neither invoked the statutory procedure for conciliation and arbitration nor sought a judicial declaration that he was not liable because he was not a member of the controlled group. He waited until he was sued—having till then emitted nary a peep to suggest that he was contesting the assessment of withdrawal liability. He thus failed to display due diligence, a precondition of equitable tolling. He who wants equity must do equity.

<u>Id.</u> at 1377 (internal citation omitted).

 Likewise, DCG failed to preserve its right to arbitration.  DCG has never sought arbitration on any question concerning its withdrawal liability.  As a consequence, equitable tolling does not apply here, and summary judgment in the Trustees' favor is, accordingly, appropriate.

The only remaining question is the amount due and owing from DCG to the Plan.  The Trustees insist that the Plan is entitled to $1.3 million because they updated their initial demand for $893,000 during discovery.  But the court's initial impression is that a calculation of withdrawal attached to discovery responses does not qualify as a "demand" under 28 U.S.C. § 1399(b)(1).   The Trustees' citation to <u>Chicago Truck Drivers, Helpers, & Warehouse Workers</u>

Union (Indep.) Pension Fund v. Loyal Casket Co., Civ. Action No. 06 C 5987, 2008 WL 938409,
*4 (N.D. Ill. Apr. 7, 2008) is not persuasive.  The Trustees are accordingly ordered to provide
supplemental briefing on the amount they "demanded" under the meaning of 28 U.S.C.
§ 1399(b)(1) within 30 days of entry of this Order.  DCG will have 30 days to respond.

**IV.    Were DCG's Payments Unlawful?**

DCG argues that because it did not have a written agreement mandating payments to the
Plan, its payments into the Plan were unlawful.  The undisputed facts do not support this
conclusion.  DCG was a party to the Drywall Memorandum Agreement, and that agreement
incorporated unspecified "Trust Agreements."  And although the Drywall Memorandum
Agreement does not specifically name the Plan, the course of dealings between DCG and the
Trustees makes it clear that DCG understood that "Trust Agreements" referred to the Plan.
Specifically, DCG tendered numerous contributions to the Plan pursuant to the Drywall
Memorandum Agreement.  Consequently, DCG's motion for summary judgment is DENIED.

**ORDER**

For the reasons stated above, the Trustee's Motion for Summary Judgment (Dkt. No. 45)
is GRANTED.  The parties are instructed to brief the issue of the amount due as directed above.
DCG's Motion for Summary Judgment (Dkt. No. 56) is DENIED.

SO ORDERED this 7th day of January, 2009.

BY THE COURT:

TENA CAMPBELL
Chief Judge

9